NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-185

WHITNEY NICOLE COCHRAN

VERSUS

STEPHEN CARL LOEWER

**********

APPEAL FROM THE
TWENTY SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 09-0877
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

**********

CHARLES G. FITZGERALD
JUDGE

**********

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Guy E. Bradberry, Judges

AFFIRMED.

**Julie Koren Vaughn Felder**
**Julie Vaughn Felder, A.P.L.C.**
**P.O. Box 80399**
**Lafayette, Louisiana 70598-0399**
**(337) 856-3444**
**(337) 856-3447 (fax)**
**Counsel for Defendant/Appellant:**
     **Stephen Carl Loewer**


**Lynette Young Feucht**
**Law Firm of Lynette Young Feucht**
**P.O. Box 1067**
**Eunice, Louisiana 70535-1067**
**(337) 550-1115**
**(337) 546-0900 (fax)**
**Counsel for Plaintiff/Appellee:**
     **Whitney Nicole Cochran**

**FITZGERALD, Judge.**

This appeal arises from a judgment modifying custody and denying contempt.

**FACTS AND PROCEDURAL HISTORY**

Whitney Nicole Cochran and Stephen Carl Loewer were never married but are the parents of a fourteen-year-old son, Camdyn. In April 2009, paternity and custody were established by stipulated judgment. In essence, the parties agreed to joint legal custody, to Whitney being named the domiciliary parent, to a schedule of physical custody, and to a joint custody implementation plan.

In the years that followed, Whitney and Stephen filed numerous custody pleadings, resulting in ongoing litigation and ever-changing custody judgments. By stipulated judgment dated August 26, 2013, for example, the parties agreed to increase Stephen's custodial periods with Camdyn. Four years later, by stipulated judgment dated October 2, 2017, Stephen's time periods were further increased and changes were made to the implementation plan. And two years after that, by stipulated judgment dated September 5, 2019, the parties agreed to change the domiciliary parent from Whitney to Stephen; the parties also agreed to shared (50/50) physical custody.

Next, in June 2021, Whitney filed a rule to modify custody, alleging changes in the child's schooling and extracurricular activities. Several months later, Whitney dismissed her rule with prejudice.

A few weeks after that, in November 2021, Stephen filed a rule for contempt and modification of custody. Whitney responded in April 2022, by filing her own action for contempt and modification of custody. Stephen then supplemented his pleadings in June 2022. He also refixed three contempt motions that he had previously filed.

The trial of all matters was held on August 22-24, 2022. At the close of evidence, the trial court ruled from the bench with extensive oral reasons. This ruling was reduced to a written final judgment signed on December 19, 2022. Oversimplifying slightly, the trial court awarded joint custody of Camdyn to Whitney and Stephen, and the court designated Whitney as the domiciliary parent. Stephen was granted physical custody on alternating weekends from Friday after school until the following Monday morning and on alternating weeks from Wednesday at 5:00 p.m. until the following Friday morning. For summer vacation and school holidays, the parties were given equal time. The court further ordered that the child be enrolled at St. Edmund Catholic School in Eunice. And finally, the court allocated the legal authority and responsibility of the parents in a joint custody implementation plan.

It is from the December 19, 2022 judgment that both parties appeal. And on appeal, Stephen asserts seven assignments of error:

1.     The trial court erred in modifying custody to name Whitney domiciliary parent and reducing Stephen's custodial time. A proper application of the Civil Code Article 134 factors should have maintained Stephen as the domiciliary parent and awarded Whitney a more limited schedule during the school year.

2.     The trial court erred when it failed to give any weight to the presumption that the decision made by the domiciliary parent regarding schooling (a "major decision") was in the best interest of the minor child and ordered the minor child to attend a school neither parent requested, thereby substituting the judgment of the court for that of both parents. Further, this issue was not properly before the court.

3.     The trial court erred when it ordered the minor child to participate on a particular travel baseball team given that, absent agreement of the parties, the decision-making authority regarding extracurricular activities (not a "major decision") belongs [sic] is that of the domiciliary parent and is not subject to judicial review.

4.     The trial court erred in unilaterally altering the parties' agreements regarding transportation of the minor child for

extracurricular activities and regarding make-up time for Stephen when neither party requested their agreements in this regard be modified.

5. The trial court erred in failing to hold Whitney in contempt of court for her numerous violations of the provisions of the judgments in place.

6. The trial court erred when it considered factual allegations raised in Whitney's June 29, 2021 Rule that was subsequently dismissed with prejudice.

7. The trial court erred, as a matter of public policy, to award primary custody to Whitney because her deliberate choices made the agreed upon custodial provisions more difficult on her, i.e., her loss of a flexible job resulting from her illegal behavior and her moving to a house further from Lafayette two months before trial.

Whitney timely answered the appeal, and she asserts the following assignment of error:

The trial judge erred in not recognizing Stephen's willful disobedience to the 2019 judgment by using vulgar and berating language to Whitney on multiple occasions, speaking disrespectfully to her family members regarding her, failing to inform Whitney that he had enrolled Camdyn in Carencro Catholic, ignoring her input, and finally, failing to maintain Camdyn's extracurricular activities.

**LAW AND ANALYSIS**

**I. Custody Issues**

All of Stephen's assignments of error, apart from number five, involve the trial court's modification of custody. These assignments will therefore be discussed together.

The paramount consideration in any determination of custody, including actions to change custody, is the best interest of the child. La.Civ.Code art. 131; *Evans v. Lungrin,* 97-541, 97-577 (La. 2/6/98), 708 So.2d. 731. In *Evans,* the supreme court clarified that "where the original custody decree is a *stipulated judgment,* the party seeking modification must prove (1) that there has been a material change in circumstances since the original custody decree was entered, and

3

(2) that the proposed modification is in the best interest of the child." *Id.* at 738. A stipulated custody judgment, as explained in *Evans,* is one where the parties consent to a custodial arrangement and no evidence of parental fitness is presented to the court. Here, all previous custody decrees are stipulated judgments.

On appeal, custody determinations are reviewed under the abuse of discretion standard. *Marksbury v. Marksbury*, 16-526 (La. 3/24/16), 204 So.3d 180. Hence, a trial court's determination can only be set aside if it arises from an abuse of discretion, such as when the factual finding is not supported by any fair interpretation of the record. *Gibson v. Bossier City Gen. Hosp.*, 594 So.2d 1332 (La.App. 2 Cir. 1991). By contrast, de novo review is used when one or more legal errors interdict the trial court's fact-finding process. *Evans,* 708 So.2d 731. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Id*. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *Id*.

With this in mind, we turn to the record evidence. Stephen testified that Whitney began to ingratiate herself with Stan Loewer and Kim Loewer between 2019 and 2021. Stan is Stephen's father, and Kim is Stephen's stepmother. According to Stephen, this damaged his relationship with his father and stepmother.

However, Stan testified that Whitney wrote to him in late 2020 to make amends after what he called a brief period of not seeing eye to eye. Both Stan and Kim testified that when Stephen learned of Whitney's effort to make amends, he became angry and demanded that they not rekindle their relationship with Whitney. Kim explained that after she and Stan reconnected with Whitney, Stephen cursed and berated them to the point that they blocked his number from their phones.

4

According to Kim, Stephen estranged himself from his father. And Stan's testimony confirmed that.

Next, Stephen testified that Whitney allowed Stan and Kim to spend time with Camdyn during her custodial periods, and that he was not advised of this nor was he offered the right of first refusal. Stephan also accused Whitney of violating the 2019 judgment because she knew that they blocked his telephone number. The judgment, after all, provides that when Camdyn is in a third party's care, that party is required to communicate directly with each parent. But after hearing Stan and Kim's testimony, Stephen conceded that he does not expect Whitney to keep Camdyn away from Stan and Kim.

The 2019 custody judgment prohibits either parent from allowing Camdyn to be in the presence of Lucas Kelly. Lucas is Stephen's stepbrother. Stephen contends that Whitney violated this prohibition when she allowed Camdyn to attend a family gathering hosted by Stan and Kim at their False River camp in July 2021. Whitney also attended the event. But Stephen's contention was refuted by Kim, who testified that Lucas was working offshore on the dates of the event.

Based on all this, Stan and Kim testified that they have limited their time with Camdyn, fearing retribution from Stephen. Stan explained that with Stephen, everything ends up in court; it's always a fight. As Stan put it: "There's zero getting along for that child and that's tragic."

Before going further, some background information is needed. Whitney is married to Aaron Cochran. Aaron's mother (and Whitney's mother-in-law) is Charlena Rainville. Whitney and Aaron have one child together, and his name is Cullen. Camdyn and Cullen are half-brothers. Beginning in 2019, Whitney, Aaron, Camdyn, and Cullen began living with Charlena in her home.

With that in mind, Stephen admitted at trial that he and his wife, Sally, telephoned Charlena on September 18, 2021. Stephen and Sally told Charlena that Whitney was plotting against Aaron, that Whitney was "psycho" and had some kind of mental illness, that Whitney was a bad person, and that Whitney should not be around Cullen.

In like manner, communication between Whitney and Stephen has deteriorated since the 2019 custody judgment. The text messages that were admitted into evidence give some insight into the problem. These messages were sent by Stephen to Whitney in 2021 and 2022. For example, in his text message of March 2, 2021, Stephen tells Whitney: "You have caused enough damage with your dysfunction. Hang out with your real mother in law that you live with. Not my [f******] parents. LEAVE MY PEOPLE THE [F***] ALONE!!!!!!" (Emphasis in original).[1] Twelve months later, on March 24, 2022, Stephen sends the following text to Whitney: "Oh yea your 'never arguing' but yet all you do is argue. What the [f***] ever Whitney. You're beyond selfish. You don't give a [f***] about anybody but yourself."

As to Camdyn's education, the 2019 judgment provided that he would attend Lafayette Christian Academy. Stephen testified that he handled the application process for that school. Thereafter, during the pandemic (2020-2021) school year, Stephen noted that he almost single-handedly managed Camdyn's participation in online learning. Stephen explained that he would frequently send Whitney numerous messages from the school reminding her of Camdyn's online assignments. Stephen further explained that once the pandemic restrictions were lifted, he enrolled

---

[1] Because of the vulgarity, we have edited some words by using brackets and including only one letter of the original word.

Camdyn in Carencro Catholic School. As he put it, he did so only after Whitney refused to discuss any school other than St. Michael's School in Crowley. It is undisputed that Camdyn is an excellent student.

In contrast, Whitney testified that during the pandemic academic year, the parties agreed that Camdyn would be enrolled in the Louisiana online virtual learning platform instead of virtual learning through Lafayette Christian Academy. Then, in early 2021, she and Stephen began discussing school options for the next academic year. Stephen pushed for Camdyn to continue with the online platform. Whitney disagreed, insisting that Camdyn needed to be back in the classroom.

According to Whitney, in March 2021, Stephen advised her that he was willing to spend the money for Camdyn to return to Lafayette Christian Academy. Stephen, in turn, scheduled a readmission test for Camdyn. Thereafter, on April 14, 2021, Whitney and Stephen met with Lafayette Christian Academy's principal to discuss the upcoming school year. Whitney recalled that during that meeting, the principal explained that Camdyn had scored poorly on the test, and that if Camdyn returned to Lafayette Christian Academy, he would be required to repeat 6th grade. Both parents agreed that this was not going to happen. Yet after that meeting, Stephen began accusing Whitney of causing Camdyn to fail the test so he could go to St. Michael School in Crowley. In a text message from Stephen to Whitney dated April 20, 2021, Stephen states that "you did this on purpose. Such a shame."

Two days later, on April 22, 2021, Stephen texted Whitney explaining that he was willing to put Camdyn back in an online program. Whitney again disagreed, reiterating her belief that Camdyn needed to be in a classroom. Seven days later, on April 29, 2021, Stephen came around to Whitney's position. So Whitney, in turn, reiterated her request for St. Michael School. Stephen simply rejected that idea

7

without suggesting an alternative school.  Whitney then told Stephen that she was hiring an attorney.  Later that day, Stephen expressed that he had no problem with a private school.

According to Stephen, he enrolled Camdyn in Carencro Catholic in May 2021. He claimed that Whitney refused to discuss the issue of school after she told him she was hiring an attorney.  Whitney denied this.  According to Whitney, she first learned of Camdyn's enrollment at Carencro Catholic in late June 2021 when Camdyn told her that he had left his summer reading book at his dad's house.  When Whitney then confronted Stephen about this, he confirmed that Camdyn was enrolled at Carencro Catholic.  Shortly thereafter, on June 21, 2021, Stephen sent a text message to Whitney, wherein he continued to accuse her of causing Camdyn's poor performance on the readmission test, stating: "you should not have coerced him into failing his test there."

Switching gears, Stephen claimed that Whitney was caught in bed with another man, and that Charlena (Aaron's mother) then kicked Whitney out of her house.  According to Stephen, Whitney and her two sons moved out of Charlena's home, leaving Aaron behind, in August or September 2021.  By contrast, Charlena testified that Stephen's allegations were false.  Charlena also testified that Whitney and the children did not "move out."

When asked at trial about the above allegations, Whitney explained that she became pregnant with Aaron's child in late April 2021.  One or two months later, she and Aaron posted the celebratory news on social media.  But according to Whitney, she then suffered a miscarriage in late July 2021.  Whitney explained that by late August 2021, she decided to stay with her mother, Marilyn, for a few weeks so that she could grieve the loss of her child.

Turning now to a different matter, Stephen alleged that in November 2020, Whitney enrolled Camdyn in a clinical trial involving COVID testing without his knowledge. When Whitney was asked about this, she explained that on the morning of November 8, 2020, she told Stephen by text that Daylon, her oldest stepson, was at the clinic getting tested for COVID. Stephen replied, "isn't everybody being tested?" Later that evening, he texted Whitney, inquiring about the COVID test. In response, Whitney explained that the test was a clinical trial promoted by her employer, Dr. Randall Miller. She further explained that the test was a typical home test where you swab the nose and mix it in a solution. And that was the extent of Camdyn's involvement.

Now to baseball. Baseball is Camdyn's passion. Both parties admitted this at trial. Camdyn has played on an elite travel team known as the Ducks for six years. Cole Frey has coached the Ducks since Camdyn joined the team. According to Coach Frey, Camdyn is the most committed player on the team: he eats, breathes, and sleeps baseball.

Indeed, baseball is specifically addressed in the 2017 and 2019 custody judgments. In relevant part, the 2017 judgment provides that "when the child participates in extracurricular activities during **STEPHEN CARL LOEWER's** custodial periods, i.e., baseball, **WHITNEY NICOLE COCHRAN** shall be accountable for all transporting responsibilities if **STEPHEN CARL LOEWER** is not able to provide transportation, after which she will return the minor child to the residence of **STEPHEN CARL LOEWER**[.]" (Emphasis in original). The distance between the parties' residences at this time was approximately thirty-five miles. The 2019 judgment, moreover, states that "[t]he minor child, Camdyn, shall be allowed to play baseball."

9

When Stephen was asked about transporting Camdyn to baseball practice, he explained that "if Whitney helps me out like in the past, taking him to practice, I will go pick him up every single time." And when asked why he had required Whitney to bring Camdyn back to Carencro in the evenings after practice, Stephen surmised that he might have had family obligations or "other things going on" that prevented him from picking up Camdyn. Yet even Stephen admitted that it was unfair for Whitney to drive from Eunice to Lafayette to pick up Camdyn from school, then back to Mowata (near Eunice) for practice, then back to Stephen's house in Carencro, and then back to her house in Eunice. And she did this day after day.

The record evidence shows that beginning in the fall of 2021, Stephen gradually withdrew his support for Camdyn's baseball commitment. And his withdrawal greatly affected Camdyn. Coach Frey testified that he noticed a big change in Camdyn's demeanor during the fall 2021 and spring 2022 season. The fall season ran from October through December, and the spring season ran from January through June. According to Coach Frey, Camdyn "was a different kid this year"; he was "stressed."

Coach Frey explained that when Camdyn was with Stephen for a week, he missed a lot of practices. Coach Frey recalled that he told Camdyn's teammates not to ask Camdyn why he missed practice because he actually cried over that issue. By comparison, Coach Frey testified that Camdyn never missed a practice when he was with Whitney. Coach Frey stated that he wished all parents were like her.

Additionally, Coach Frey explained that he had not seen Stephen at a single game this year, even when they played at the sports complex in Carencro. He described Camdyn's baseball experience as the child's "safe place."

When Stephen was asked if he attended any of Camdyn's games during the past year, Stephen admitted that he had not. When asked why, Stephen responded that he told Camdyn because he did poorly on the Lafayette Christian Academy readmission test, he was punishing Camdyn by not going to his games.

In May 2021, Camdyn was invited to play for another team in the Cal Ripken Baseball World Series in Branson, Missouri. Stephen accused Whitney of signing Camdyn up without telling him. But Whitney denied this at trial. According to Whitney, she notified Stephen about the invitation at the end of May 2021.

Stephen, on the other hand, testified that Whitney did not notify him of the tournament until the middle of June 2021, and the games were scheduled to begin on July 4. Stephen then explained that he and his family had already planned a vacation for the July 4th weekend, which was during his custodial period. As such, he told Whitney that Camdyn would not be able to participate. Camdyn was upset. He was at Stephen's home, and he texted his mother to intercede.

According to Stephen, from June 27 through July 3, Camdyn kept leaving his house every hour or so to ride his bike to the back of the neighborhood. Camdyn later admitted to Stephen that he was riding his bike to communicate with his mother on Snapchat regarding whether he would be allowed to play in the World Series. Ultimately, on July 3—the day before tournament started—Stephen changed his mind and decided to let Camdyn participate.

On a different topic, Stephen testified that on January 27, 2020, Whitney's stepson, Daylon (then fifteen years old), was arrested at his paternal grandmother's home. Charlena is Daylon's paternal grandmother. According to Stephen, Daylon was arrested on four counts of terrorism threats and one count of a bomb threat; his actions made statewide news headlines; and multiple schools were forced to close

11

for a week because of the threats. Stephen also noted that the police confiscated all the children's cell phones from the home, including Camdyn's phone.

Whitney, in turn, confirmed that Daylon had been arrested for making a bomb threat over the internet. She admitted that it was certainly a serious situation. But she clarified that the arrest did not happen at Charlena's house. Instead, Daylon was arrested at his *maternal* grandmother's home which was also where the threat was made. In a text to Whitney, Stephen expressed his concern for the incident and safety of Camdyn. In response, Whitney vowed to protect Camdyn no matter what. Kim, who reported the bomb threat to Stephen, testified that she was impressed with how Whitney handled the situation. And thereafter, she never had concerns when Camdyn was in Whitney's care. Following the incident, Daylon moved in with his mother, Chasity.

And finally, Stephen testified that Whitney illegally obtained his prescription records and his wife's prescription records by using login credentials provided by her employer, Dr. Miller. According to Stephen, Whitney disseminated the information to Aaron and Charlena, violating numerous laws. Complaints were filed with the Louisiana State Board of Medical Examiners and United States Department of Health and Human Services. Whitney was ultimately terminated from her job. And while Whitney admitted accessing the prescription records, she denied disseminating any of the information.

Based on all this, the trial court found that there had been a change of circumstances material to Camdyn's wellbeing since the most recent custody judgment of September 2019. The trial court then turned its attention to La.Civ.Code art. 134, which enumerates fourteen factors for the court to consider in determining the best interest of the child. "The list of factors provided in Article 134 is

nonexclusive, and the determination as to the weight to be given each factor is left to the discretion of the trial court." *Hodges v. Hodges*, 15-585, p. 4 (La. 11/23/15), 181 So.3d 700, 703. Moreover, "the trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La.Civ.Code art. 134 but should decide each case on its own facts in light of those factors." *Coody v. Coody*, 20-071, p. 8 (La.App. 3 Cir. 11/12/20), 307 So.3d 1093, 1099.

Here, the trial court addressed its application of the Article 134 factors in its oral reasons for judgment. The trial court's findings are as follows:

**(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.**

The trial court found that this factor is not applicable.

**(2) The love, affection, and other emotional ties between each party and the child.**

The trial court found that both parties equally satisfied this second factor.

**(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.**

The court also found neutrality as to the third factor, explaining that it had "no doubt that both parties are interested in, and will facilitate, and have the capacity and disposition, to give Camdyn love, affection and spiritual guidance, and continue his education and rearing.

**(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.**

As to this factor, the trial court "had no evidence that either party has not provided the child food, clothing, medical care, [and] other material needs."

13

**(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.**

Here, the trail court found that Camdyn "split his time equally between the two [parents]. Not a factor."

**(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.**

The trial court found neutrality with this factor, explaining that "both parents of Camdyn are married, and have been married approximately the same amount of time."

**(7) The moral fitness of each party, insofar as it affects the welfare of the child.**

As to the seventh factor, the trial court found no issue with the moral fitness of either party insofar as it affects Camdyn's welfare.

**(8) The history of substance abuse, violence, or criminal activity of any party.**

Here, the trial court did not "find factor (8) . . . to be an overriding factor in this case. It's minimal, if at all."

**(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.**

The court did not give any weight to this factor.

**(10) The home, school, and community history of the child.**

Here, too, the trial court did not find this to be an overriding factor.

**(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.**

The trial court gave this factor significant consideration. At the time of trial, Camdyn was thirteen years old, and he provided a strong and well supported preference to live with his mother.

14

Primarily, Camdyn wants to spend more time with his half-brother, Cullen, with whom he has a strong bond.[2] Also, when Camdyn is with his mother, the family unit consists of mom (Whitney), stepdad (Aaron), half-brother (Cullen), and stepbrother (Cole). According to Camdyn, he and his mother do many things together. On the other hand, when he is with his father, the family unit is limited to dad (Stephen) and stepmom (Sally). As Camdyn put it, he and his father do nothing together.

**(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.**

This factor weighed heavily in favor of Whitney. In its oral reasons, the trial court provided the following explanation:

> Number (12), the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. The exception doesn't apply here. I want to express some concerns. Despite the discord between Stephen Loewer and Whitney Rainville, despite Ms. Rainville and Mr. Loewer's father and stepmother having had an on again, off again relationship, she appears to have recognized the importance of those grandparents to Camdyn, and has attempted to foster it, but important to me also, is both parties are married, have spouses, and I wanted to look at the evidence of, does the spouse of the party also seem to promote family? How does the spouse of a party treat the other party? I've got to say that, and I'll call her "Sally," because that's what she goes by, Loewer, did not make me feel like she was going to be willing to participate in making a family between Whitney, Camdyn and Stephen. I said it when the evidence came out, and I'm going to say it my decision. Stephen wanted to take issue with the fact that Whitney was embracing [Chasity,] the mother of her husband's children, and having all of the kids together, or having the two of them together, and the fact that there were photos on a social media page about that. Now granted, okay, [Chasity's] got a criminal background. Criminal. I'm concerned she's got a background. Again, communication could have solved that by simply saying, what are y'all

---

[2]     *Cf. Howze v. Howze*, 99-852, p. 3 (La. 5/26/99), 735 So.2d 619, 621 ("Normally, the welfare of children is best served by leaving them together, so they can have the full benefit of companionship and affection.").

doing? Like the photo shows, we're doing crafts. It wasn't any other issue there. She may have had a drug history. She may drink, but none of that was evident at the time the kids were there. I commend Ms. Rainville for doing that, because that's the only way to make this work. When there are parents and stepparents, they all have to get along, and be on the same page, if at all possible, on how to raise children. It's clear that baseball is extremely important to Camdyn, no doubt, and he and I talked about that. I told him, no matter how important it is, it's not more important than education, and that if you can't keep your grades up, you shouldn't be allowed to play ball. That was the rule at my house, both when I was a kid, and when I was a dad. There's no evidence to indicate that baseball has affected his actual school work. There's an allegation that the testing, at Lafayette Christian Academy, on the same day that there was a tournament, resulted in Camdyn not doing his best on a test. That by everyone's admission, nobody knew [if that] had anything to do with whether he could return to Lafayette Christian, only his placement. There is, what appears to be, evidence that Stephen believed that Whitney had something to do with Camdyn's less than best effort, so he wouldn't have to return to Lafayette Christian. I don't believe that. Whether Camdyn didn't want to go back to Lafayette Christian, and did what he did, I don't think so, because by everyone's admission, mom and dad didn't know that the test had anything to do with whether he could go back to Lafayette Christian, therefore, there's no way they could have told him that, so he had no knowledge of that. Did he possibly rush, because he didn't want to miss his tournament? Maybe, because maybe, he didn't realize just how important it was. I don't know. He was a twelve year old at the time, maybe, at best. The other concern I have is that Stephen Loewer, at one point, recognizes that his kid eats, sleeps and drinks baseball, and loves baseball, and that's it's important to him; and that because of what happened at the Lafayette Christian Academy testing, his discipline for that, was to tell his son that he wasn't going to attend any more baseball games, although it happened a little later when he told him that, until he proved, the child, proved to Stephen that his education was more important than baseball. Stephen says, "When I was a kid, I wanted to be a farmer, and I wanted to go the farm. When I didn't have good grades, my daddy wouldn't let me go to the farm." I get that. That's how you discipline them. It was never, you can go to the farm, but you're never going to be there with me. I don't get that. The end result is, Stephen didn't go to baseball games of his son to discipline him. I want to talk about the idea, which is a great one, and that is not to involve a child in ongoing family litigation. I order it. I beg for it. I've even chastised and punished people who violated that order, but I want to state this, the idea that you're going to keep a thirteen year old from knowing that this is going on, when you're at home making calendars, diaries, and spending all the time you do on writing down, and documenting why the other side didn't do what they were supposed to do. If you think you can keep that from your child at thirteen years old, you are fooling yourself, because it's not possible. If you want to keep

it from your child, don't do it. I have no doubt that when the Branson World Series issue came up, and Camdyn was in his father's week of custodial period, and was told that he couldn't go, that he was upset. He told me that he was. I have no doubt that he reached out to his mother, to find out, could she fix the problem? I personally think the way that could have all been avoided, was for Stephen to never deny him the opportunity to go. Proper communication between the parties probably could have facilitated that, but there is no trust between these parties. They don't trust each other about anything. While I realize that Cole Frey is Camdyn's baseball coach, and that he wants him to play baseball, Cole did speak about Camdyn, about his love for baseball, about his being a student of the game, how important it was to him, and how it was his 'safe place,' and the difference he saw in Camdyn recently, where he wasn't his self. I realize that, and Stephen admits to it, he says, 'I'm not a sports guy.' I get that. As much of a sports guy as I am, I had a middle son that was not a sports guy. I just found something else to do with him, and I realize that Stephen has testified that, "It's just not possible," with his work schedule, to get him to practice in Mowata, when he has him. I understand that. I get that sometimes work requires, and you can't make the sacrifice that I always tell people they need to make for their children, but I don't think Camdyn should be punished by it. Certainly after this baseball year, meaning the '22, '23 season, which happens to coincide with his eighth grade school year, he'll be going to high school. Travel ball is going to be over. He's going to be playing baseball wherever he goes to high school, wherever that is. I've already put into evidence the distance from Whitney Rainville's home to Carencro Catholic. It's approximately, depending on which route you take, and which route you take, depends on the traffic, it's as much as thirty-three miles. Her testimony concerning how long it takes to wait in line to drop him off, is undisputed. Despite Stephen living in Carencro, his wife, Sally, testified it takes twenty minutes to get to the school from their house. I'm assuming she's factoring in how long it takes to be in line. Stephen said, ten to fifteen. We're dealing with joint custody. I'm not undoing joint custody, but joint custody doesn't require an equal sharing of time or physical custody. Substantial time, rather than strict equality of time, is what is required to assure frequent and continuing contact with both parents. There is no easy way to make this work, but Stephen's testimony and Sally's, is that now, it's just the two of them, in Carencro at the home. None of Sally's children are going to be there for now. They both work. There's no other support system there, in Carencro, to cover any of Stephen's obligations. He's made it clear in text messages, it's not Sally's job. She's not going to drive here, there and wherever.

17

**(13) The distance between the respective residences of the parties.**

Whitney lives just east of Eunice, and Stephen lives in Carencro. The distance between their respective residences is approximately thirty-five miles. And at all relevant times, Whiney and Stephen have lived in the same general area. Thus, the trial court did not weigh this factor in favor of either party.

**(14) The responsibility for the care and rearing of the child previously exercised by each party.**

Factor fourteen was not specifically addressed.

On appeal, Stephen asserts that the trial court erred in modifying custody to name Whitney as the domiciliary parent and reducing his custodial time. Stephen contends that this error was caused by the court's misapplication of the above Article 134 factors. We disagree.

Put simply, based on its consideration of the Article 134 factors, the trial court concluded that it was in Camdyn's best interest for Whitney to be designated as the domiciliary parent and with Stephen having more limited time periods. And based on our review of the conflicting testimony and record evidence, we hold that the trial court did not abuse its discretion in making those factual determinations regarding Camdyn's best interest. This assignment is thus without merit.

In his next assignment, Stephen contends that the trial court erred when it failed to give any weight to the presumption that the decision made by the domiciliary parent regarding schooling was in the best interest of the minor child.

This assignment implicates La.R.S. 9:335 (emphasis added), which states:

> A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.
>
> (2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so

that the child is assured of frequent and continuing contact with both parents.

(b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.

. . . .

(3) The implementation order shall allocate the legal authority and responsibility of the parents.

B. (1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.

(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.

(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. *All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.*

In this case, Whitney did not file a motion pursuant to La.R.S. 9:335(B)(3) challenging Stephen's choice of school. Moreover, a motion brought under La.R.S. 9:335(B)(3) is not the only procedure by which the trial court can address the decisions or decision-making authority of the parents.

Here, for example, the parties filed competing rules to modify custody. Once the trial court reached the decision that joint custody was in Camdyn's best interest, it was required to render a joint custody implementation order. La.R.S. 9:335(A)(1). And importantly, the "implementation order shall allocate the legal authority and responsibility of the parents." La.R.S. 9:335(A)(3). This is exactly what the trial court did: the court rendered a joint custody implementation order which, among

19

other things, delineated the authority and responsibility of each parent concerning decision making.[3]

Again, the trial court modified custody to name Whitney as the domiciliary parent. The trial court further determined that it was in Camdyn's best interest to attend St. Edmund private school in Eunice. And in our view, this decision is supported by the record evidence. For instance, the evidence shows that Camdyn attended St. Edmund Elementary School through the fourth grade and that he has maintained friends from that school. Camdyn's extended family—maternal grandparents and paternal grandfather—live in Eunice and the surrounding area. Stephen even testified that his entire family, including his dad and grandfather, attended St. Edmund. In addition, Carencro Catholic—which is Stephen's choice of school—is thirty miles from Whitney's residence. While this might benefit Stephen in terms of convenience, it is not in Camdyn's best interest, especially considering that the child resides primarily with Whitney.

Restated concisely, the trial court correctly applied the law in deciding what school Camdyn would attend. Moreover, the trial court did not abuse its discretion in finding that St. Edmund was in the child's best interest.

---

[3]    In *J.P. v. A.D.*, 18-555, p. 7 n. 6 (La.App. 3 Cir. 2/20/19), 265 So.3d 860, 865 n. 6, a different panel of this court explained:

> Louisiana Revised Statutes 9:336 also provides that "[j]oint custody obligates the parents to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority." Major decisions "normally include decisions concerning major surgery or medical treatment, elective surgery, and schools attended, but not the day-to-day decisions involved in rearing a child, e.g., bedtimes, curfews, household chores, and the like." *Griffith v. Latiolais*, 10-0754 (La. 10/19/10), 48 So.3d 1058, 1069 (quoting Kenneth Rigby, 1993 Custody and Child Support Legislation, 55 La. L.Rev. 103, 113 (1994)). Non-major decisions are not subject to judicial review. *Id.*; *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 738.

Next, Stephen asserts that the decision-making authority regarding extracurricular activities belongs to the domiciliary parent and is not subject to judicial review, and that the trial court erred in unilaterally altering the parties' agreements regarding extracurricular activities, transportation of the minor child, and make-up time for Stephen.

For the same reasons as above, this assignment of error is also without merit.

In Stephen's next assignment, he contends that the trial court erred when it considered factual allegations raised in Whitney's June 2021 motion that was subsequently dismissed with prejudice.

Critically, this assignment or error is neither briefed nor supported by any citations to the record. And the record in this case is voluminous: it consists of five volumes, and the transcribed witness testimony totals 749 pages. Because of these deficiencies, a competent review of this assignment is not possible. We therefore deem this assignment as abandoned. Uniform Rules—Courts of Appeal, Rule 2–12.4.

And finally, Stephen asserts that "[t]he trial court erred, as a matter of public policy, to award primary custody to Whitney because her deliberate choices made the agreed upon custodial provisions more difficult on her[.]" We disagree.

The trial court here had the benefit of seeing the parties and witnesses and hearing their testimony. After hearing the evidence and weighing the Article 134 factors, the trial court determined that a change in domiciliary status was warranted. There is simply no evidence that the court's judgment is contra bonos mores.

In the end, while we might have weighed portions of the testimony and evidence differently, we cannot say that the trial court abused its great discretion in modifying custody.

## II. Contempt Issues

Stephen and Whitney filed competing contempt motions. The trial court denied these motions. And on appeal, Stephen and Whitney assert that the trial court erred in denying their respective motions.

In *Burst v. Schmolke*, 10-1036, pp. 5-6 (La.App. 4 Cir. 4/6/11), 62 So.3d 829, 833, the fourth circuit provided the following statement of law:

> Contempt of court is defined in La.Code Civ. Pro. art. 221 as "any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority." There are two types of contempt. A direct contempt is defined in La.Code Civ. Pro. art. 222 as "one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record." A constructive contempt of court is defined in La.Code Civ. Pro. art. 224 as "any contempt other than a direct one." Although a district court has discretion to determine whether to find a person guilty of constructive contempt of court, a finding that a person willfully disobeyed a court order in violation of La. C.C.Pro. art. 224(2) must be based on a finding that the accused violated an order of the court "intentionally, knowingly, and purposefully, without justifiable excuse." *Lang v. Asten, Inc.*, 2005-1119, p. 1 (La.1/13/06), 918 So.2d 453, 454. Moreover, an appellate court should reverse the trial court's decision only when it finds an abuse of discretion. *Baker v. Baker*, 42,182, p. 6 (La.App. 2 Cir.6/20/07), 960 So.2d 1264, 1268; *Rogers v. Dickens*, 2006-0898 (La App. 1 Cir. 2/9/07), 959 So.2d 940.

Stephen contends that the trial court erred in denying his contempt motion because he presented sufficient evidence proving that Whitney allowed Camdyn around Aaron while he was consuming alcohol, that she involved Camdyn in legal proceedings, that she bad-mouthed Stephen to Camdyn, and that she allowed Stephen's parents to take Camdyn during her custodial periods and without giving Stephen the right of first refusal.

On the other hand, Whitney asserts that the trial court erred by failing to recognize that Stephen's "vulgar and berating" language to her was willful

disobedience of the 2019 judgment. Whitney also argues that Stephen spoke to family members in a manner that was disrespectful to her, that Stephen ignored her input about Camdyn's schooling, and that Stephen failed to maintain Camdyn's extracurricular activities. And this, too, violated the 2019 judgment.

Importantly, to constitute a constructive contempt of court, the mover must prove the defendant's "willful disobedience" of a lawful judgment. La.Code Civ.P. art. 224(2). Moreover, as a predicate to finding a party guilty of contempt for willfully disobeying a court order, the trial court must find that the defendant violated the order intentionally, purposefully, and without justifiable excuse.

In summary, the trial court here was presented with conflicting versions of events. Because the trial court was in a better position to evaluate the demeanor and credibility of the parties and the witnesses, we cannot say that the trial court abused its discretion in denying the contempt motions.

## DISPOSITION

For the above reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to Stephen Carl Loewer.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.